DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

# STATE OF NEW JERSEY.

## MARCH TERM, 1867.

---

### ELIZABETH HORNER v. ABEL WEBSTER, EXECUTOR OF JOSEPH B. HORNER, DECEASED.

The plaintiff and decedent were married in 1853. Her father afterwards dying intestate, she became entitled to a distributive share of his estate which share, amounting to fourteen hundred dollars, was paid by the administrator of the father to the husband, in two installments. Part of the money thus received the husband used for his own purpose; another part he put out at interest on a bond and mortgage, payable to himself; and the residue of the fund existed, at the time of his death, in the form of a check, which he had taken from the administrator, payable to his own order. In a suit brought by the plaintiff against the executor of her deceased husband, to recover from his estate the amount of her distributive share which had come to his hands, it was held that she was entitled to recover the amount of the check which he had received, and which remained in his possession at the time of his death, but not any other part of said share.

---

In *assumpsit*.

This case came before the Circuit Court of the county of Hunterdon, and was argued upon the following statement of facts, agreed to by the parties:

Elizabeth Horner, the plaintiff, married Joseph B. Horner in 1853.

Joseph B. Horner departed this life in August, 1864, having first duly executed his last will and testament, by which he appointed Abel Webster the sole executor thereof.

Elizabeth, as one of the heirs-at-law of Isaac R. Srope, who died intestate, in the county of Hunterdon, in April, 1862, was entitled to a distributive share of the estate of said decedent, to the amount of about sixteen hundred dollars.

Of this distributive share, fourteen hundred dollars was paid by the administrators of said Isaac R. Srope, deceased, to Joseph B. Horner, in his lifetime, as follows:

Eleven hundred dollars thereof was paid by said administrators to Joseph B. Horner, April 1st, 1863, who loaned seven hundred dollars thereof to one Thomas L. Brink, who executed a mortgage for the same to Joseph B. Horner, on the 1st day of April, 1863.

For the remaining three hundred dollars, the administrators of said Isaac R. Srope gave to Joseph B. Horner their check, payable to his order. This check remained in his possession at the time of his decease, and was appraised as part of his estate.

The above stated suit is brought to recover from the executor of Joseph B. Horner the fourteen hundred dollars which he received for his wife, from her father's administrators.

Upon this statement of facts, is the plaintiff entitled to recover? and if so, how much?

Dated April 25th, 1865.

B. VAN SYCKEL,<br><i>Attorney of plaintiff.</i>

A<small>BEL</small> W<small>EBSTER</small>, *Executor.*

The case was argued by *B. Van Syckel*, for plaintiff, and *J. T. Bird*, for defendant.

B<small>EASLEY</small>, C<small>HIEF</small> J<small>USTICE</small>. The object of this action is to recover from the executor of the husband the moneys re-

ceived by him as the distributive share of the wife in the estate of her father. The marriage took place in the year 1853. The father of the wife died intestate, in the year 1862, and his administrators paid to the husband of the plaintiff the portion of the estate due to her on distribution among the next of kin. Part of the moneys thus received the husband applied to his own uses; another part he invested in bond and mortgage, payable to himself, and the residue he had taken in the form of a check from the administrators of his wife's father to his own order, and which remained in his possession, and was unpaid at the time of his death.

The suit is brought by the widow, against the executor of the husband, to recover the moneys thus received.

Apart from the effect of the recent legislation modifying the property rights, which formerly inhered in the marriage contract, it is clear that the moneys in dispute belong to the estate of the husband. By force of the general principles of the old law, the husband acquired an interest in all choses in action which came to his wife during coverture, and he could perfect such interest into a complete title by any act which reduced such property into his possession for his own use. His power was undoubted to sue for and recover, or to release or assign the debts due to his wife; and when such debts were recovered and brought into his possession, it was evidence of a conversion of the same to his own purposes, and the moneys thus became, as a general thing, absolutely his own. The rule was the same with regard to legacies and distributive shares which fell to the wife during marriage. In the present case, the husband exercised such a dominion over the property in question that it was plainly taken by him to his own use. Part of it was consumed by him; another portion was invested in the shape of a loan in his own name, and for the residue he held a check payable to his own order. This consumption of a part of the fund, and the transformation of the residue of the chose in action of the wife into a debt due to himself in his own right, were

acts which would seem to amount, incontestably, to such an appropriation of the moneys as would vest, at common law, the sole and absolute right to them in the defendant's testator; consequently, upon the general principles of the law, unaffected by statutory innovation, this suit cannot be supported.

But it is insisted that the plaintiff is entitled to succeed in her action by force of the act of 1851, entitled "an act for the relief of widows in certain cases." *Nix. Dig.* 282, § 35.* This is the only ground on which the plaintiff's case is rested in the brief of counsel. The enactment in question consists of a single clause, in the words following: "The widow of any person who shall die testate or intestate shall be entitled to demand and receive from the executor or executors, administrator or administrators, of such person all such goods and chattels, choses in action, or other personal property, which, at or immediately before the coverture between the deceased and his said widow, belonged to her, or which, during coverture, came to her by bequest, gift, or inheritance, and which at the time of the death of the deceased remained in his possession."

It is obvious that it is only certain kinds of property coming to the wife during coverture which fall within the operation of this act. It is not all the property devolving in the female which is to be affected by the new regulation, but only such as accrues by bequest, gift, or inheritance. All other descriptions of goods and chattels are left to control and disposition in accordance with the ordinary principles of law. But I do not agree to the position taken by the counsel of the defendant, that the description of property in the statute does not properly embrace the share of a decedent's estate to which a married female succeeds, as the next of kin, by force of the act regulating distributions. Such construction would be exceedingly narrow, and would evidently frustrate the legislative intent. Nor could it be justified on legal grounds, for its effect would be to erase altogether from the statute the words "by inheritance." What can

*Rev.*, p. 398, § 13.

Horner v. Webster, ex'r of Horner.

these terms mean, when applied to personalty, unless they denote the acquisition of personal estate by the wife by right of kindred upon the decease of the prior owner? It is true that the term is usually applied in law to express the passage of real estate from the ancestor to the heir, but when used in connection with goods and chattels, it aptly, if not technically, signifies the succession to the ownership.

I think the moneys in question came to the wife by "inheritance" within the meaning of these words, as used in the statute.

But to clothe the widow with the right contended for, it is not enough that the property be derived from one of the enumerated sources. Another circumstance must concur; that is, such property must remain *in the possession of the husband at the time of his death.* This obviously is a most important limitation on the right of the widow. Without this qualification, the statute would, at one stroke, have subverted the entire law regulating the ownership of personalty resulting from the contract of marriage, and would have deprived the husband of all substantial interest in it. Under a law of that character, the husband might have possessed the right to a kind of qualified usufructuary enjoyment of the personal estate of the wife, but the latter would have continued to be the real owner in substance and effect. It is believed that no one can read this act, and not perceive that a change so comprehensive and radical was not within the contemplation of the legislature. The intended alteration was much more circumscribed, and hence the clause confining the operation of the act to such portions of the goods and chattels and choses in action of the wife as remained in the husband's possession at the time of his decease.

It is presumed that this restrictive clause will be conceded to be, to a certain extent, definite and unambiguous. Thus, if a husband, during coverture, should sell an article of property, such as a horse or a carriage, which had come to his wife by gift, by bequest, or by inheritance, and should

transfer the possession to the vendee, it is conceived that all persons would admit that such sale was legal, and would defeat the claim of the widow. Unless the restrictive clause has this effect it has no significance; and consequently, thus far at least, the scope of the provision would seem to be undeniable. And yet upon what principle, then, is it that it is to be so limited in its operation as not to be extended to the choses in action of the wife? It is clear that this species of property stands in the statute on the same footing with the other parts of the personalty, and that the restrictive clause applies to the entire personal estate with equal force, if the terms used are employed in their usual acceptation. To make it claimable by the widow, the chose in action, in the same manner as a visible chattel, must be in the possession of the husband at his death; the thing itself is to remain, not the price or equivalent of the thing. So distinctly is this idea expressed in the act, that it appears to me that in no conceivable case can the widow claim, unless trover or replevin would lie against the representative of the husband. The statute declares she may demand and receive from the executor or administrator the chattels or the choses in action which devolved to her during coverture, but it confers no right to demand or receive any other thing in the place of the property described. But in the case in hand the chose in action of the wife did not remain in the possession of the husband at the time of his death. On the occurrence of that event, the debt which had accrued in right of the wife had been converted into a debt due to the husband, and consequently, at the statutory juncture there was in existence no chose in action of the wife on which the act could operate.

Nor does there seem to be much force in the suggestion, that the act thus construed will afford but very inadequate protection to the married woman. It is said the husband can readily change the form of the chose in action of the wife, and thus deprive her of all the benefit designed to be conferred upon her. But this objection applies to every

part of the effect of the restrictive clause; for it is evident that if the husband can novate a debt to the wife, and take a new security to himself, so he can, with equal facility, sell any article belonging to her, and transfer it into cash. It is quite impossible to apply the statutory requisite of the continuance of the possession of the husband to one class of the enumerated property, and not to another. The court is bound to give the restrictive words their legitimate effect, and they therefore must be held to embrace choses in action as well as goods and chattels existing in a tangible form.

The foregoing view, with regard to the proper construction of the statute in question, is entirely coincident with that expressed by the Chancellor, sitting as Surrogate General, in a recent case decided in the Prerogative Court. Had I inclined to a different result, I should, without hesitation, have deferred to this high authority, unless my conviction appeared to me to rest on the most stable foundation; for, independent of the great weight due to any opinion emanating from so distinguished a quarter, it would certainly be a circumstance to be regretted for the courts of common law to differ, in the interpretation of the statute, from a tribunal whose province it will be, in general, to enforce its provisions, and whose decisions in that respect will be subject to no appeal.

The case to which reference is here made is that of *Vreeland* v. *Schoonmaker*, decided in October, 1863. The following were the facts: a legacy was due to the wife, and with the assent of her and her husband, was secured by a bond payable to her. Subsequently the husband received the proceeds of this bond, and reinvested them in another form, taking such new security in his own name. This was the state of the fund at his death, and it was claimed that the widow was entitled to it by force of the act of 1851, above criticised. But the Chancellor denied that the act had any application to the case. Upon this point he uses this language: "The decree of the court below can derive no support from the provisions of the act of March 12th, 1851, for

the relief of widows in certain cases. That act, by its terms, extends only to the specific chattels, choses in action, or other personal property which belonged to the wife at her marriage, or which subsequently came to her, and which remained in the hands of the husband unchanged at his death. Had the bond given to the wife during her coverture remained in the hands of the husband until his death, the case would have fallen within the operation of that statute. But the bond having been collected by the husband, and the funds, in whole or in part, invested in his own name, it is clear that the widow cannot claim the protection of the act. The act of 1851 effected no change in the rights of the widow *to her choses in action* acquired before or during the coverture, and remaining in the hands of the husband at the time of his death. But, in terms, it transfers the title of the wife's chattels in possession of the husband from the estate of the husband to the wife, saving the rights of the husband's creditors."

In my opinion, the disposition of the money in question is not in any respect regulated by the act of 1851.

Although, in the brief of counsel, it is stated that it is not conceived that the statute of 25th March, 1852, for better securing the property of married women, enters into the discussion, it is but proper that I should state that I have carefully examined and considered the effect of that enactment in its application to the present case. My conclusion is, that the plaintiff can claim, under this law, no right to the fund in question.

By the statute now referred to, the property secured to the married female is such as she received by " gift, grant, devise, or bequest." Giving to these terms the least technical and most liberal signification, it is not perceived how either of them can be extended so as to embrace moneys coming to the wife, as next of kin, under the statute of distributions. It may well be conjectured that it was the intention of the legislature to secure to the wife this species of property, for there seems to be no just ground why it should be left to

the control of the husband. But there is, in express terms, an enumeration of the several classes of property which are to be set apart for the wife, and such enumeration, according to the settled rules of legal construction, excludes all other classes. *Expressio unius est exclusio alterius.* The act declared that property derived from four sources is to be protected; the court is not permitted to say that property coming from a fifth source is within the legislative intent. This possibly might be to improve, but it certainly would not be to construe the law. It will be found, upon comparison, that this act of 1852 was copied, with but slight alteration, from that of New York, passed in the year 1848, and that the same imperfection, above noticed in the specification of the property intended to be protected, existed in the original statute. In the following year, however, the defect in the New York enactment was removed by an amendment, which extended the operation of the act so as to embrace property descending to the female by inheritance. So the statutes on this subject in Ohio, Wisconsin, Florida, and other states will be found to be couched in terms of equal comprehensiveness. (See *Appendix to Lord's Rights of Married Women.*) In the case of *Ross* v. *Adams*, 4 *Dutcher* 164, Mr. Justice Vredenburgh, in commenting on the act of this state, in its application to real estate, seems to consider that the expressions contained in it are broad enough to embrace all modes of acquiring property, except by descent.

In like manner, I am not able so to enlarge the phraseology as to make it comprise that description of property which devolves upon the wife as next of kin, and which she certainly does not receive either by " gift, grant, devise, or bequest."

My conclusion is, that the plaintiff cannot recover the moneys in dispute, or any part of them.

Upon this opinion of the CHIEF JUSTICE, judgment was entered for the defendant.

A writ of error was afterwards brought to remove the proceedings and judgment into this court. General errors were assigned, and the case was argued by *Van Syckel*, for plaintiff in error, and by *Bird*, for defendant.

The following opinions were delivered.

THE CHANCELLOR. In this cause, the question decided below and argued here, is upon the construction of the act of 1851,[*] entitled "an act for the relief of widows in certain cases." The plaintiff was married to defendant's testator in 1853; he died in 1864. Her father died intestate in 1862, and her distributive share of his estate, amounting to fourteen hundred dollars, was paid to her husband. Of this, he invested seven hundred dollars in a bond and mortgage in his own name, which he held at his death; three hundred dollars he received of the intestate's administrators in their check, payable to his order, which he held at his death; the disposition made of the residue does not appear. The action is to recover the fourteen hundred dollars thus received for his wife.

The act for the relief of widows was intended to alter the common law. By that, the goods and chattels of the wife belonged absolutely to the husband, upon marriage, and all that came to her during marriage, became instantly his property. It was the same with her money, whether in coin, bank notes, or other representatives of coin, used and known as money. or any thing in which property passed by delivery. Whether it came to her possession or his, the same result followed, the possession of the wife was that of the husband. Her choses in action and chattels real, were his only when he reduced them into possession, but the right so to do was in him. On his death, all her goods and chattels, except choses in action not reduced into possession, went to his executor or administrators; these survived to her.

The act of 1851 did not affect the husband's rights during his life; it was not intended for that purpose, but only to change the succession at his death. The act can only have

---

[*] *Rev., p.* 398, § 13.

effect, when the property came to the wife in the manner mentioned in the act, and remained in the possession of the husband at his death. The amount received in this case by the husband was personal property; it was such whether received in the form of coin, bank notes, or checks; if in the form of a check, it would be called a chose in action. The word inheritance, in the act, must be held to mean succession; it is a meaning in which that word is frequently used, though not its strict technical meaning; but as in this act it is only applied to personal property, and will have no effect unless so construed, it must, by well-settled rules, be so construed.

This property "came to the plaintiff" in the sense intended by the act; property that came to the wife, means here, evidently, property she became entitled to, not that came to her actual manual possession.

Goods, cattle, and farming utensils, given or bequeathed by her father, taken and driven away by her husband, though never in her possession, "came to her" within the meaning of this act.

But the act requires that the property must remain in her husband's possession at his death; and as the act is in derogation of the common law, it must not be extended by construction, but must be applied only to things within its provisions. The check was an order for money, part of her father's estate, which the executor had put in bank, and gave to her by this order upon the bank.

It was an order for her father's property, that came to her by inheritance, and it remained in her husband's possession at his death. It was literally, in the words of the act, a chose in action, that came to her by inheritance, during coverture, remaining in her husband's possession at his death. The term, chose in action, cannot be taken, in this act, in its technical sense. It is used technically to signify merely a right to personal property not in possession.

Therefore, in this act, choses in action in the husband's possession, cannot mean mere rights, but must be held to

mean the instruments or evidence by which those rights are shown, as notes, bonds, checks, &c. And if a husband had in his possession the identical bank notes, bonds, checks, or other securities that he received as the portion of his wife, they are within the words and meaning of the act, and his widow is entitled to demand and receive them from his executors. And for this purpose it would make no difference if a bond or note was assigned to him in his own name, or a check was payable to his order, or that he had placed the bank notes or securities, payable to bearer, among his own effects, showing an intention to appropriate them to his own use. The common law doctrine of the effect of reducing into possession, throws no light on this question. The statute only applies to chattels and money in his possession, and choses in action reduced to possession. It can apply in no other case. If the wife's distributive share had not been paid over to him, it would not be in his possession at his death; his executors could never collect or get possession of it, as it would survive to her; and so she could not demand or receive it from them. So with a bond taken in her name, or assigned to her in the husband's life; it would not go to his executors, or be inventoried by them, but would remain her property.

The act simply changes the law of succession at his death, and directs that these specific articles shall, if in his possession, go to his widow, and the only right given is to demand and receive them of his executors. The only duty of the executor is to deliver them. The act did not intend, like the married woman's act, to take away the control of the husband in his life over his wife's property, and to make him accountable for it if used or spent.

Any legislator opposed to changing the old property relations between husband and wife, might well have voted for this act. By its terms, it would affect only a very small and well-defined portion of the wife's property, that which the husband, by choice or inadvertence, had kept in the very form in which he had received it. The construction con-

tended for on part of the plaintiff, is that the husband must be considered to die in possession of all her property received by him, not restored or paid back to her in his life. This is contrary to the words of the act, and there is no manifestation of intention to support it, and would effectually secure to her, when she survived him, all the property she ever had, if his estate was solvent.

For these reasons, neither the bond and mortgage, as it was not the chose in action that came to the plaintiff, nor the money loaned on it, as that was not in testator's possession at his death, could be demanded of his executors by the plaintiff. This was expressly decided by Chancellor Green, as Ordinary, in *Vreeland* v. *Schoonmaker.* The four hundred dollars cannot be recovered, because it does not appear in the case that it was in his possession at his death.

The plaintiff is entitled, by the provisions of this act, to recover the sum of three hundred dollars, the amount of the check, with interest from the testator's death, but not the residue of the sum of fourteen hundred dollars.

But although the act of 1852, for the better securing the property of married women, was not relied on by the counsel for the plaintiff, the court below, very properly, took it into consideration. The action is for the money so received, and if by that act, property that comes to the wife by succession, during coverture, is secured to her separate use, and the testator received the share of the plaintiff, and appropriated to himself any part of it, she is entitled to recover such part here or in equity, as so much money received to her use.

The only section of that act under which it can, in this case, be included, is the third. By that " it shall be lawful for any married female to receive, by gift, grant, demise, or bequest, and hold to her sole and separate use, as if she were a single female, real and personal property, and the rents, issues, and profits thereof ; and the same shall not be subject to the disposal of her husband, nor be liable for his debts." It is contended, that this case is not included in the act, because the word *succession,* or some equivalent word to denote

the manner in which this money was received, is not used. It certainly is not included in the terms, "gift, grant, devise, or bequest;" it is neither; nor is it included in the word "descent," added in this section by the supplement of March 27th, 1866, though that supplement would seem to have been suggested by this case. For here the word descent would apply to the real estate mentioned, and its meaning would not be extended by the necessity of giving it some effect.

It seems strange that in an act for the object declared in the title and other provisions of this act, the securing to married women the use of their own property, that the property which, above all others, ought to be secured to her, that coming by inheritance and succession from her ancestors, coming by force of law, should be excluded. It cannot be supposed to have been the intention of the makers to omit it. But this intention will not affect the act, if by mistake as to the meaning of the terms employed, or negligence in framing it, that which was intended has not been enacted. The intention as promulgated, as given out to, and understood by, those to be guided and governed by the law, is the intention that is to prevail, not an intention concealed and covered up in the breast of the legislator, and never expressed. But where words will admit of two constructions, the object and intention of the act, as expressed in its title, preamble, or other provisions, may be called in to determine which construction shall prevail.

There is no doubt but this act was generally supposed, from its enactment until the supplement of 1866, to include property that came to married women during coverture by succession and descent; and that it is now thought by the person who drafted, and the legislators who passed the supplement of 1866, that property by succession is included in it; and there can be no doubt but that in the State of New York, when their married woman's act of 1848 was amended in 1849, by inserting in it the words, "by inheritance," it was supposed to include personal property by suc-

cession. Yet in that state the words, "by inheritance," must be held more strictly to their technical meaning, because their statute of descents expressly enacts, that these words in it shall be confined to real estate.

The words of this section will certainly admit of the restricted meaning given to them by the Circuit Court and conceded by counsel, yet they will as clearly admit of the construction that will include succession and descent in conferring capacity of holding separately, and thus carry out the design of the act as indicated in its title and other provisions.

By this section two objects are to be accomplished: the one is to enable a married woman to receive property; the other is to enable her to hold it to her separate use, as if single. The provisions are separate, and although combined in one sentence, there are no words that expressly make them dependent; and each provision can be separated and construed by itself. If the sentence had been "it shall be lawful for a married female to receive by gift, grant, demise, or bequest, real or personal property, and hold real and personal property to her own use," there can be no doubt that it would give a right to hold any real or personal property to her own use, however received, that she had capacity to receive. This clause as it stands may, with propriety, be read in that manner; there is nothing to confine the property to be held to her use to property received as authorized by the section, nor to restrict it from any real or personal property that she may own or hold. If the words, "when so acquired," had been added after "hold," or if the words, "real and personal property," had been placed after "bequest," and then the words "and hold *the same* to her separate use," the restricted construction, so far as depends upon the words used, would have been unavoidable; the reference to the property which she was enabled to take would confine the holding to herself to that.

By the common law, a married woman could take property by descent or succession; the law threw this upon her. But

she could not take by gift, grant, demise, or bequest, without the consent of her husband ; and then she could disagree to it on her husband's death.    2 *Kent's Com.* 150.

This disability the first provision removes ; it was necessary for that object, and in it the word descent was properly omitted.    When that was provided for, it was no doubt intended to provide, that she should hold to her own use, free from her husband's control and debts, all her property not provided for by the first two sections of the act; and it is simply provided that she may "hold real and personal property to her separate use."    Had it been intended to restrict the capacity of holding to·her separate use to property acquired in the four modes designated, it would have been easy to have so restricted it, by express words, in some such manner as above pointed out.    As they stand, we are at liberty to give the words the effect evidently intended by the legislature in passing the act, and indicated on its face.    The restricted construction may be considered by many the more natural one to be placed upon the words as they stand.    If that were conceded, yet, in cases admitting of two constructions, the one that gives effect to the intention and policy declared and adopted by the act, will always be preferred to the more literal, and natural meaning of the words.    That intention and policy here, is to secure the property of married women to their separate use, and the restricted construction fails to do it, as to a large portion of that property which there is no conceivable reason to except.

The New York act of 1848, from which our act was copied, as amended by the act of 1849, in conferring the capacity to receive, includes property coming by inheritance, and not that coming by succession.    It also gives power to devise and convey, which, by the restricted construction, would be confined to the property so acquired.    The more recent and liberal act of 1860 uses the same words, substituting "descent" for "inheritance," and does not include succession in the clause giving capacity to take.    In this age, the relative amount and importance of personal prop-

erty has vastly increased, especially in commercial cities, and these acts are chiefly needed for it. And in the seventeen years for which they have been in force there, cases must have occurred in which the question, whether the husband or his creditors were not entitled to the wife's distributive share, arose. Yet we look in the reports in vain for any decision upon it. In the cases of *Winans* v. *Prebles*, 31 *Barb*. 371, and *White* v. *Wager*, 32 *Barb*. 250, the Supreme Court seems to assume that a married woman can dispose, by deed or will, of all her property, however acquired. And in the last named case, in the Court of Errors, 25 *N. Y. Rep.* 332, Denio, J., speaking of the act of 1848, as amended by that of 1849, says : "This was done by the act of 1849, which authorizes a married woman to convey and devise real and personal property as if she were unmarried." He does not limit it to property acquired by the enabling power in that section. And the absence of any decision, and of any legislative amendment, would leave us to infer that in that state personal property, received by succession during coverture, is in all cases considered within the protection of these acts.

The complicated structure of the third section of the act of 1852 seems to me to suggest the restricted construction. Like words, placed unencumbered in a sentence, connected grammatically in the same way, would, at first impression, be read distributively, as referring to each power conferred. An act that should make it lawful for any one *to build and occupy* a frame house of certain dimensions, within the fire limits of a city, would unhesitatingly be held to permit one to build, and another to occupy; or one that should authorize any one to construct and use, on the public highways in the state, a wagon with a track exceeding five feet, would not be read or construed as authorizing only the man who built such wagon to use it. Yet these are precisely parallel cases.

The same distributive reading may seem the natural one in a more complicated sentence. Let any one read the third

section of the New York act, as amended in 1849, (3 *Rev. Stat. of N. Y.*, *5th ed., p.* 240,) which is in these words : "Any married female may take, by inheritance or by gift, grant, devise, or bequest, from any person other than her husband, and hold to her sole and separate use, and convey and devise real and personal property, and any interest and estate therein, and the rents, issues, and profits thereof, in the same manner and with like effect as if she were unmarried, and the same shall not be subject to the disposal of her husband, nor be liable for his debts," and he will not hesitate. to view it as giving power to devise and convey all property, whether held by virtue of the capacity to receive conferred by that section, or by other sections of that act, or in any other way.    And this, as observed above, from the language of the judges, and the absence of all express decisions in their reports, seems to be the received construction in that state.

In . this state, in the case of *Vreeland* v. *Schoonmaker, adm'r of Vreeland,* decided by Chancellor Green, in the Prerogative Court, at November Term, 1863, the question arose on the claim of a widow against her husband's administrator.    The marriage was before 1852.    The money in question came in part from the proceeds of a sale made by her after 1855, of lands descended from her mother, who died in 1850, and in part from her share of the estate of her father, who died intestate in 1855.    Her husband had invested the money in his own name.    She demanded the mortgage.    The Chancellor held that, by the married woman's act, she was entitled to receive it from her husband's administrator.    In his opinion, he places the decision on the second section, which, he properly held, included any property which a woman married at the passage of the act might at any time acquire.    The authorities cited support that construction. But this opinion throws no light upon the construction of the third section ; he gives no intimation of his views concerning it.

If this is the settled construction of the second section,

and we adopt the restricted construction of the third, the absurdity will follow, that property coming by succession or descent to a woman married before 1852, will be to her separate use, while that which comes in the same manner to one married since, will belong to her husband or his creditors; and this would be so, when it came from the same father dying in 1855. The younger sister would bitterly complain of such exposition. And, in all cases, a legacy or devise would go to the wife; property by descent or succession would be in the power of the husband.

The well settled rule of the common law, that a remedial statute, such as this is, even where in derogation of the common law, as all remedial statutes are, should be benignly construed, so as to remedy the evil and carry out the intention and policy of the legislature, should be applied to this act. In my view, the words will warrant this construction; and it will make the whole statute, and the system adopted by it and other statutes on the same subject, harmonious, intelligible and just.

That this act should be liberally construed, to effectuate its object and protect the property of married women, was declared by the Supreme Court, in *Naylor* v. *Field*, 5 *Dutcher* 288, and by the courts of New York, in *Goss* v. *Cahill*, 42 *Barb*. 315; *Power* v. *Lester*, 17 *How. Pr. R.* 413, and several other cases.

And if we apply to it an elementary rule of construction, in the manner in which it is applied to another part of the New York act by Justice Wright, in 32 *Barb*. 250, it is clear that property coming to a married woman by succession is within the mischief, and within the reason of the remedy, and that the words, if necessary, should even be extended to include it.

There is nothing in the opinion of Justice Vredenburgh, in *Ross* v. *Adams*, 4 *Dutcher* 164, which has been referred to, that conflicts with this view. In that case the lands came to Mrs. Adams, not by descent, but by deed of bargain and sale. Counsel contended that the words gift and grant

must be confined to their technical meaning, and would not include a deed of bargain and sale. The question was, how far the act enabled her to receive to her separate use by deed. The doctrine, as well as the decision, only applies to the power to receive by deed.

The expression of Chief Justice Whelpley, in his opinion in the same case, in this court, in 1 *Vroom* 514, is confined to that point by words, " all the different modes of acquiring property by deed were here intended."

This view of the law will entitle the plaintiff to recover the sum of seven hundred dollars of her money, received by her husband and invested in his own name, by suit in a court having jurisdiction of the matter.

During the life of both parties, no action could be brought at law by the wife against the husband, for her estate received by him, for at law no action can be maintained by either against the other; and, although at first inclined to hold the contrary, I have come to the conclusion that no action at law can be maintained by the wife against her husband's representatives for money belonging to her, received by him in his lifetime as so much money had and received for her use. The husband, in his life, and his representative after his death, can be made to account for her separate estate received by him, not given to him by her. But this account has always been had in equity. No case is found where any action at law was ever brought, although for many years married woman have had, by settlement or gift, estates to their separate use, as to which their rights were the same as their rights now are to their separate estates under the married women's act. The mere fact of the receipt of her money does not make his representatives liable to account for it to her. That is controlled by the circumstances, which cannot be so well considered at law as in courts of equity. It seems to be settled, by a long series of decisions, that if he receives her separate estate against her will, or without her knowledge, his representatives shall in all cases account. If he receives the principal of her estate,

they must account, unless a clear, express, voluntary gift of it is shown; but if he receives the rents and income of her estate, and expends it with her knowledge, and without her dissent, it is acquiescence from which a gift to him will be presumed. *Clancy's Rights of Married Women* 352; 2 *Story's Eq. Jur.*, § 1396; *Christmas* v. *Christmas*, 2 *Eq. Cases Abr.* 152; *Townsend* v. *Windham*, 2 *Ves., Sr.*, 1; *Pawlet* v. *Delaval*, 2 *Ves., Sr.*, 663; *Powell* v. *Hankey*, 2 *P. W.* 82; *Squire* v. *Dean*, 4 *Bro. C. C.* 326; *Gage* v. *Dauchy*, 28 *Barb.* 622.

These principles, which must govern the recovery in such cases, are such as render the matter a proper one for the jurisdiction of courts of equity only. And it is not a subject over which we should, by our decisions in this case, give the courts of law a jurisdiction which they have not before exercised. As the check could have been recovered in trover or replevin, under this case, as submitted, a recovery for it may be had here.

The judgment must be reversed, and judgment rendered for the plaintiff for the amount of the check, with interest from the death of the testator.

DEPUE, J. This case was heard in the Hunterdon Circuit upon the following statement of facts, agreed upon by the counsel:

"Elizabeth Horner, the plaintiff, married Joseph B. Horner in 1853.

"Joseph B. Horner departed this life in August, 1864, having first duly executed his last will and testament, by which he appointed Abel Webster the sole executor thereof.

"Elizabeth, as one of the heirs-at-law of Isaac R. Srope, who died intestate, in the county of Hunterdon, in April, 1862, was entitled to a distributive share of the estate of said decedent, to the amount of about sixteen hundred dollars.

"Of this distributive share, fourteen hundred dollars was paid by the administrators of said Isaac R. Srope, deceased, to Joseph B. Horner, in his lifetime, as follows:

"Eleven hundred dollars thereof was paid by said administrators to Joseph B. Horner, April 1st, 1863, who loaned seven hundred dollars thereof to one Thomas L. Brink, who executed a mortgage for the same to Joseph B. Horner, on the 1st day of April, 1863.

"For the remaining three hundred dollars, the administrators of said Isaac R. Srope gave to Joseph B. Horner their check, payable to his order. This check remained in his possession at the time of his decease, and was appraised as part of his estate."

The question to be decided by this court is, whether, in a court of law, the wife is entitled to recover of the executor of her deceased husband any or all of these moneys, under the statement of facts above set out.

Her right to a recovery must be based upon one or both of the two acts of the legislature, the one entitled "an act for the better securing the property of married women," passed March 25th, 1852, and the other entitled "an act for the relief of widows in certain cases," passed March 12th, 1851.

Conceding that, by the act of March 25th, 1862, property which came to the married woman by descent or succession, since the passage of that act, is secured to her as her separate property, that construction will not aid the plaintiff in this case.

This property, which was hers, was received by the husband during coverture, under some authority given to him by his wife. His right to receive it, and to discharge the administrators of her father, she does not question by bringing her action against the administrators of her father to recover her distributive share, but she brings her action in a court of law against her husband's representatives, to recover the money of them. The case does not show that the husband ever made to his wife an express promise to pay the money to her, so that he received it as her agent, or for her benefit; and the only ground upon which this action can be maintained is, that the law will imply an *assumpsit* on

the part of the husband to repay his wife from the mere receipt by him of moneys that belonged to her.

No such implication will arise from the act of 1852; nor will it find any countenance in the rules of the common law, in relation to remedies and parties to action.

During the lifetime of the husband, she can maintain no action against him.   Is her remedy, then, suspended until the husband be dead, and then being without the provisions of the statute of limitations, is she to be permitted to bring in against her husband's representatives the whole arrearages of her claims, including the rents, issues, and profits of her real estate, and the proceeds realized from the sale of her goods and chattels—for they are equally within the protection of the act—on an equality with his ordinary creditors?   If so, many an estate, which otherwise would be amply sufficient to pay all the creditors of the husband, will be rendered insolvent by the claims of the wife.   It is manifest, from these considerations, that whatever remedy she may have would fall peculiarly within the jurisdiction of courts of equity, where, if she is entitled to relief, it will be afforded to her upon equitable principles, having due regard to the rights of creditors.   In *Vreeland* v. *Vreeland's adm'rs*, decided in the Prerogative Court, October Term, 1863, where an administrator was allowed a credit for a payment made by him to the widow of a sum of money, which the husband had received, in his lifetime, of the wife's separate estate, and had invested in a bond and mortgage in his own name, the late Chancellor, in delivering his opinion, says: "If, while they—(that is, the husband and wife)—are living together, he is permitted to take the interest or profits of the estate for their mutual benefit, or for his own use, it should, as between the husband and wife, raise no presumption prejudicial to her rights.   I say as between the husband and wife, because it is obvious that as it regards the interests of third parties, the possession and control of the funds of the wife by the husband may create equities, and give rise to questions of fraud, which will involve very different consid-

erations." And the Chancellor cited, with approbation the case of *Sherman* v. *Elder*, 1 *Hilton* 476, where it was held that where the husband, by the permission of the wife, has the exclusive control of her separate estate and its accumulations, by means whereof he is enabled to obtain credit and carry on trade, the property is liable to the claims of the husband's creditors.

In the case of *Vreeland* v. *Adm'rs of Vreeland*, the Chancellor held that the wife's assent to the reduction by the husband of her chose in action into possession, for the mere purpose of *investment*, was no evidence of her assent to its conversion to the use of the husband. In that case, the wife's money which the husband had received had by him been loaned on bond and mortgage taken in his own name; but it appeared that the husband, when he negotiated the loan, treated the money as his wife's money, and obtained her consent to the loan. In permitting the wife to receive the amount thereof out of his estate, the court, in the absence of the claims of creditors, as between the wife and next of kin of the husband, applied a well known principle of equity jurisprudence of following trust funds, and holding that they were not discharged of the trust by the form in which they were invested. A court of law has no such powers; and if a court of law takes to itself jurisdiction of these equities, no distinction can be made between funds invested and money received by the husband, and used by him in his ordinary business. The statute protects not only all the real and personal property of the wife, but also the rents, issues, and profits thereof, without discriminating as to the state in which they may be found at the husband's death, so that her claim against his administrator must rest upon the same foundation, whether it consists of moneys received by him and invested, or of the rents of her real estate, or the profits realized in its cultivation, or the proceeds of her goods and chattels sold, which had been employed by him in business, or expended in the necessary support of the family. If her remedy grows out of the statute, it must be co-extensive

with it; and no distinction can be made in the remedy between one species of her property and another. His liability must exist in the one case, as well as in the other.

As remarked above, the plaintiff's case rests upon an implied *assumpsit*, no express promise to pay the wife being shown. In *Ridgway* v. *English*, 2 *Zab.* 409, it was held that the law would not imply a promise by the father to pay a child, who, after arriving at age, continued to dwell in his family, and labored for him and was supported in his family, for services, from the mere fact that such services were rendered. The same principle has been applied to a step-child, and to all other cases where the parties stand, in relation to each other, of support on one side and services on the other. *Williams* v. *Hutchinson*, 3 *Comst.* 312; *Robinson* v. *Eastman*, 2 *Denio* 152; 2 *Parsons on Cont.* 46.

The same considerations which prevent the implication of a promise in these cases, apply with equal force in the case before the court.

The intimate relations of the husband and wife during coverture forbid their standing in the attitude of contracting parties. She receives her maintenance and support from the husband, an obligation which he is obliged to discharge, whether she has any means of support of her own or not, and whether she is capable, by her services, of aiding in the support of the family or not.

They have no divided interests. The property and services of each during the coverture are devoted to one common purpose, the accumulation of a family estate, in the enjoyment of which each shares. The husband is still the head of the family, and entrusted with the management of its business. If, by the wife's permission, he receives money belonging to her, and applies it to the maintenance of the family, or invests it in business or otherwise, and from its accumulations, or its use, acquires an estate which his wife and family equally enjoy, which after his death they share, no good reason can be perceived why, after his death, the

wife should be allowed to recover of his estate her contribution to that common estate.

The foregoing discussion proceeds upon the consideration that the plaintiff's right to recover is based upon an implied promise. Much of the foregoing reasoning, however, would apply in case an express promise by the husband to repay the wife had been proved.

To give effect in a court of law to an express contract, made by the husband with his wife, even in a suit against his personal representatives, would effect so entire a sweeping away of the common law disabilities of both the husband and wife, that the innovation should be left to express legislative action, rather than originate with the courts. At law, contracts made between husband and wife during coverture, are absolute nullities. Her remedy, if she has any, is in equity. 2 *Story's Eq. Jur.*, §§ 1372, 1373. Whether in the case now before the court she would be entitled to her remedy in equity, it is not at this time necessary to consider. The conclusion is, that the plaintiff cannot recover any or either of the moneys in question, by virtue of the provisions of the act of 1852.

The rights of the plaintiff under the act entitled "an act for the relief of widows in certain cases," passed March 12th, 1851, (*Nix. Dig.*, *p.* 282,*) remains to be considered. The property enumerated in this act is goods and chattels, choses in action, or other personal property, which, at or immediately before the coverture, belonged to her, or which, during coverture, came to her by bequest, gift, or inheritance, and which, at the time of the husband's death, remained in his possession. The qualifying words, bequest, gift, or inheritance, in the statute, are inseparably annexed to that part of the act which confers rights upon the widow, and are to be taken as restricting the operations of the act to property acquired by the modes specified.

By the term choses in action, in the act of 1851, something more was intended than a note, bond, or personal security, made to the wife in her own name, which, at common law, if

*Rev., p.* 398, § 13.

Horner v. Webster, ex'r of Horner.

not collected in the husband's lifetime, would have survived to the wife, independently of the statute. It was designed to comprehend all rights to receive or recover a debt or money which accrued to the wife during coverture. A distributive share is a chose in action, within the meaning of this statute, and is protected by it, if it can be brought within any of the qualifying words of the act, as coming to the wife by bequest, gift, or inheritance.

The property enumerated in the act is only what, in law, is designated as personalty, and does not comprehend any property which can be designated as real estate. The word inheritance, in its usual legal acceptation, applies to lands descended. At common law, chattels did not descend by inheritance, except in the instances in which they came under the description of heir-looms. In its popular acceptation, the word inheritance includes all the methods by which a child or relation takes property from another at his death, except by devise, and includes as well succession as descent. Unless we give to that word in this act the popular rather than the strict legal signification, it is practically useless in the act. As applied to personal property, it can mean nothing else than to signify succession, and the property in question is, therefore, comprehended in the designation of property coming to a married woman in the manner designated in this act.

To enable the plaintiff to recover, the property in question must answer a further requirement. It must have remained in the possession of the husband at the time of his death. This act was passed when the agitation of the rights of married women was first commenced, and before they had been accorded the more perfect protection which was given to them by the act of 1852. The law, as it was when the act of 1851 was engrafted upon it, gave a husband all his wife's goods and chattels, and permitted him to reduce her choses in action into his possession, and make them his.

The act of 1851 did not deprive the husband of his property in his wife's goods and chattels entirely, nor take away his

right to reduce her choses in action into his possession during his lifetime. He might still sell her goods and chattels and collect her choses in action during his lifetime, and she was without remedy. All this act of 1851 gave the widow, was a right to demand, and have of her husband's representatives, such of them as remained in his possession unchanged at the time of his death. *Vreeland* v. *Vreeland's administrators*, cited above.

The eleven hundred dollars which was received of the administrators of the wife's father, was received by the husband, so far as the act of 1851 is concerned, in the exercise of his undoubted right to reduce his wife's choses in action into his possession. The right once exercised, made the money his money, and at his death it was in his possession, not as his wife's property, but as his own. Of this, the four hundred dollars which was not invested, or at least has not been traced, manifestly cannot be recovered, unless upon the ground that the husband's estate is liable to the wife, for all of her estate he received during coverture, a position which finds no support either under the act of 1852 or the act of 1851. No distinction can be made between the seven hundred dollars invested by the husband in the mortgage given to him by Brink, and the four hundred dollars not invested. By the receipt of the money of the administrators, his wife's claim on them for her distributive share was discharged, and the money received was the husband's property. Whether he spent it, or invested it, can make no difference. The investment was made in his own name, and is not within the protection of the act of 1851. *Vreeland* v. *Vreeland's administrators*.

The check was not taken by the husband as an investment, as the evidence of a loan by him to the administrators, or as a new security for their indebtedness to his wife. It was merely a means by which he should be enabled to receive the money of the administrators out of the bank, and therefore cannot be regarded as a novation of the debt. The act contemplates that the choses in action, which it was

passed to protect, should come into the possession of the husband. A distributive share is not such a chose in action as could be carried away, or come into the possession of the husband in any other way than by means of something which represents it—either money, a chattel, a check, or some new security. If the identical money, or chattel received by him, remains in his possession at his death, capable of identification, she is entitled to it. If the husband had gone to the bank and received the money on the check, it would still have been her money, and if the identical bills or coin had remained in his possession, the wife would have been entitled to them, as much as if he had received them directly from the administrators of the wife's father.

The check, at the husband's death, was the property of the wife, and she was entitled to receive it from his executor. If the executor received the money on it, and converted it to an use to which he could not lawfully apply it, the widow may have her remedy at law against him.

That remedy is based on the wrongful act of the executor, and will not require for its support any contract, either express or implied, between the husband and wife.

My opinion is, that the plaintiff is entitled to recover of the defendant the amount of the check, with interest from the time of demand. For this reason, the judgment below must be reversed.

DALRIMPLE, J., dissenting. The plaintiff's counsel conceive that she cannot recover by virtue of any provision contained in the married woman's act. That concession, I think, is well made. I thereupon conceive it to be unnecessary at this time to intimate what may be the proper construction of that act. I do not think the court is now called upon to express any opinion as to what, if any, remedy the plaintiff may have in equity for the moneys realized by her husband from the distributive share in question.

I do not think the action can be sustained on the act of 1851. That in no way abridged the rights which the com-

mon law gave the husband during his life over the wife's choses in action. It enacts that all goods, chattels, and choses in action which the wife owned at the time of her marriage, or which came to her by gift, bequest, or inheritance, at any time during the coverture, and which remain in the hands of the husband at the time of his death, shall be delivered by his executor or administrator to the wife, on demand made.

This enactment is simply declaratory of the common law, so far as it affects choses in action. The choses in action of the wife, which remain in the hands of the husband at the time of his death, not reduced to his possession, by the common law survive to the wife. The goods and chattels of the wife which belonged to her, as it came to her during coverture, would, by the common law, on the death of the husband, have gone to his executor or administrator. The statute secures them to the wife, provided they remain in the hands of the husband at the time of his death. This is the only alteration the statute makes in the common law. I agree with the opinion of Chancellor Green, pronounced in the Prerogative Court, in the case of *Vreeland* v. *Schoonmaker,* that the act now under consideration " effected no change in the rights of the widow to her choses in action acquired before or during coverture, and remaining in the hands of the husband at the time of his death."

The only question remaining, is, whether the distributive share, for the proceeds of which this suit is brought, was reduced by the husband in his lifetime into his possession. If it was, the wife had no further interest in or right to it, which she can enforce by an action at law. It seems quite clear, that the husband reduced to his possession and converted to his own use the first payment of eleven hundred dollars. The wife's right to that is gone, at least at law. In regard to the check, the only facts we have before us, are that it was delivered to the husband, made payable to him, and remained in his possession at the time of his death. The legal presumption on this state of facts, I think, is that the

husband, by virtue of his marital right, collected so much of the distributive share as was represented by the check, with interest, to convert the same to his own use. This was what the law terms a reduction by him of the same into his possession. It thereby became his; neither he in his lifetime, nor his representatives after his death, became liable to the wife for the amount so collected, nor for the check in specie, which, at the death of the husband, was his chose in action, not his wife's. I am of opinion, that neither by virtue of the act of 1851, nor of 1852, nor at the common 'law, can either an action of *assumpsit* or *trover*, be maintained by the widow against the husband's personal representatives for the check or amount thereof. The judgment below should, therefore, in all things be affirmed with costs.

*For affirmance*—VREDENBURGH, DALRIMPLE. 2.

*For reversal*—The CHANCELLOR, ELMER, BEDLE, WOOD-HULL, DEPUE, FORT, WALES, CLEMENT, VAIL, KENNEDY. 10.

And thereupon the following order was made :

" This cause having been presented for argument at the November Term, eighteen hundred and sixty-six of this court, and the case having been read, and as well the arguments of the counsel of the respective parties heard thereon, and the record and proceedings in the court below, together with the assignment of errors to this court having been duly considered and diligently examined, and time having been taken to determine the same, and mature deliberation having been had thereon, and this court being of opinion that, in the giving of judgment in this cause in the court below error exists—

It is, therefore, at the present March Term of this court, ordered, adjudged, and decreed, that the said judgment of the Hunterdon Circuit Court in this cause, must be reversed, and judgment rendered for the plaintiff for the amount of the check, with interest from the death of the testator ; and

that the writ, return, and record to this court, and the pro-
ceedings herein had, be remitted to the said Circuit Court;
and that the costs in this court be taxed."

On motion of

B. VAN SYCKEL,
*Attorney of plaintiff in error.*